Filed 2/27/14  Samantha S. v. Super. Ct. CA5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| SAMANTHA S.,<br><br>        Petitioner,<br><br>   v.<br><br>THE SUPERIOR COURT OF TULARE COUNTY,<br><br>        Respondent;<br><br>TULARE COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>        Real Party in Interest. | F068463<br><br>(Super. Ct. Nos. JJV066587A & JJV066587B)<br><br><br>**O P I N I O N** |

## THE COURT*

ORIGINAL PROCEEDINGS; petition for extraordinary writ review.  Hugo J. Loza, Commissioner.

Jean Bourn, for Petitioner.

No appearance for Respondent.

Kathleen Bales-Lange, County Counsel, and John A. Rozum and Amy-Marie Costa, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

\*      Before Levy, Acting P.J., Gomes, J., and Detjen, J.

Samantha S. is the former prospective adoptive mother of six-year-old J.C. and two-year-old R.M. whom respondent Tulare County Superior Court freed for adoption (Welf. & Inst. Code, § 366.26, subd. (c))[1] in 2013. In September 2013, the Tulare County Health and Human Services Agency (agency) removed the children from Samantha's custody after discovering Samantha allowed the children's biological mother, Sarah, to live with them. Samantha objected to the children's removal and requested the superior court's review. The superior court acting as the juvenile court found it in the children's best interests to remove them from Samantha's custody and so ordered.

Samantha seeks writ review (§ 366.28) of the juvenile court's decision. She contends the juvenile court violated her due process rights and erred in removing the children from her custody. We deny the petition.

## PROCEDURAL AND FACTUAL SUMMARY

In November 2012, the Riverside County Juvenile Court sustained allegations that Sarah's drug abuse, transient lifestyle, domestic violence and untreated mental illness placed then four-year-old J.C. and one-year-old R.M. at a substantial risk of harm. The juvenile court also sustained allegations that J.C. and R.M.'s fathers failed to provide care or support for them, ordered family reunification services for Sarah and R.M.'s father and transferred the case to Tulare County, Sarah's county of residence.

In December 2012, the agency placed the children with Samantha who was romantically involved with Sarah and lived with her and the children for approximately a year. During that time, Samantha assumed a parental role for the children and they looked to her to meet their emotional and physical needs. Samantha reportedly broke off her relationship with Sarah when the children were placed with her.

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

In April 2013, the Tulare County Juvenile Court conducted an uncontested six-month review hearing. The agency recommended the juvenile court terminate Sarah's reunification services. The agency reported Sarah initially expressed a strong desire to reunify with the children and said she would do whatever was necessary to that end. However, she stopped participating in her services plan and visited the children less frequently as if she had given up on reunifying with them. The juvenile court terminated Sarah's reunification services and set a section 366.26 hearing for August. The court ordered visitation for Sarah to occur twice a week for two hours under the supervision of the agency or its designee. The agency apparently designated Samantha to supervise the visits.

In June 2013, the agency received a report that Sarah was with Samantha at a medical appointment for one of the children and appeared to be "under the influence." She was "fidgety" and made "odd body movements." When this occurred again in August, Samantha was counseled not to allow Sarah around the children when she was under the influence.

In its report for the section 366.26 hearing, the agency recommended the juvenile court approve adoption with Samantha as the permanent plan for the children and informed the court that this was Sarah's wish. The agency reported Samantha was 18 years old, never married and was raising her 13-year-old brother. She dropped out of school after seventh grade but was employed and rented a three-bedroom home.

In August 2013, at an uncontested section 366.26 hearing, the juvenile court terminated Sarah's parental rights to J.C. and R.M. as well as those of the children's fathers.[2] The juvenile court did not order visitation.

---

[2] Sarah filed an appeal from the termination order. The appeal is pending before this court (F068011).

On September 6, 2013, in the early evening, the agency received a report that Sarah was living with Samantha and the children and the children had no food to eat or suitable clothing. The agency was aware of the allegation that Sarah was living with Samantha but had not been able to prove it. An on-call social worker investigated but no one was at the house.

Three days later, social worker Cecilia Gomez made an unannounced morning visit at Samantha's house. Gomez knocked for approximately eight minutes, first on the front door and then on the windows near the door. Samantha opened the door wearing a tank top and pajama bottoms and explained she was asleep and did not hear Gomez knocking. Samantha allowed Gomez into the home and showed her the children's bedroom. The children were lying on the floor watching television. Samantha's brother was lying on the only bed in the room. Gomez asked Samantha where the children's beds were. Samantha said that J.C. urinated on his bed and it was in the garage. She looked in the closet for R.M.'s bed and then stated that it was in her bedroom. Samantha took Gomez to her bedroom where there were two mattresses on the floor with blankets. She said she did not know where R.M.'s crib was. Gomez heard a shuffling noise and asked to see the rest of the bedroom. She saw a woman in the closet putting on a T-shirt. The woman who identified herself as "Liza" had two visible hickeys on her neck. "Liza" turned out to be Sarah.

Samantha denied that Sarah lived with her. She said Sarah took her and R.M. to the emergency room the night before because he had blisters in his mouth. She asked Sarah to take them because she needed her help. Gomez noted that Sarah was very fidgety and kept moving around and repeating, "I love my kids, I was just trying to help them."

Gomez contacted her supervisor and the decision was made to remove the children. Gomez asked to see the children's clothing. There was no clothing in the

children's closet and there was not a dresser in their room. Samantha said their clothing was in a bag but did not give Gomez a bag of clothing or otherwise provide any clothing for the children. Gomez also asked to see what food was available in the home. There was canned food in the cupboards but very little refrigerated food. Samantha explained that they had been out of town with grandparents and had not gone grocery shopping. When told that the children were going to be removed, Samantha and Sarah cried. Sarah told Gomez she would kill herself so that the children could be returned to Samantha. Sarah got into a red truck and drove off.

Gomez put the children in a car and drove away. As she did, she saw Sarah driving back in the direction of Samantha's home. During the ride, J.C. said he was "very hungry" and had not eaten. He said Sarah lived with him and R.M. The children were placed together in a foster home.

On September 12, 2013, Gomez provided Samantha a Notice of Emergency Removal (JV-324) to which was attached a copy of the addendum report JV-324 explaining the circumstances requiring the children's removal (JV-324 report).

On September 18, 2013, Samantha filed an objection to the children's removal in pro se, claiming the children were wrongfully removed. The juvenile court set a removal hearing for October 17, 2013.

Samantha retained attorney Jean Bourn who, on October 9, 2013, filed a motion for discovery and continuance of the October 17 hearing. The court continued the hearing to October 31 and ordered the department to provide Bourn documents related to the reason why the children were removed from Samantha by October 23.

In an addendum report filed for the October 31 hearing, the agency stated that two women fitting Samantha and Sarah's description were seen on September 9 and in mid-October circling J.C.'s school in a red Chevrolet truck around dismissal time. The

5

women told school staff that they were J.C.'s older sisters. The one fitting Sarah's description was reportedly "extremely fidgety and twitched often."

On October 31, 2013, Bourn stated she received the JV-324 report and some of the social worker's notes two days before the hearing. However, she said there were references in the notes to a police report and pictures that were taken of the home she was not provided. In addition, there were social workers at the home who were not present in court that she did not have time to subpoena. She said she was ready to proceed and objected to a continuance. She told the court she would determine if she needed further discovery after Gomez, who was present, testified.

The juvenile court continued the hearing and confirmed with Bourn that she wanted photographs taken of the home and social workers' notes reviewed by staff member Gary Kupfer and she wanted social workers Lilly Wallace and Nick Saucedo present. Asked if there was "anything else," Samantha's attorney responded "No." The juvenile court ordered county counsel to provide the additional discovery by November 4 and continued the hearing.

On November 14, 2013, the juvenile court convened the removal hearing and took judicial notice of the case file over Bourn's objection.

Samantha testified and denied letting Sarah live with her, stay with her or spend the night. She said that the day the children were removed, she called Sarah's mother to tell her she was taking R.M. to the hospital. Sarah's mother could not go with her so she went by herself. When she got to the hospital around 3:50 a.m. Sarah was already there. Samantha was at the hospital until around 5:00 a.m. When she arrived home, Sarah pulled up behind her, gave her some things for R.M. and left. About an hour later, Sarah returned with medications for the baby, diapers and baby wipes. J.C. saw her and asked if he could see his mother for a little while. Samantha told Sarah she could only stay for

20 minutes. While Sarah was holding R.M., he vomited on her. Samantha told her to go in her closet and get a shirt. At around that same time, Gomez arrived.

Samantha was asked why the children did not have beds. She explained that J.C. urinated in his bed just before she had to leave town for a family emergency. Her uncle's wife was dying. She threw J.C.'s bed out and did not have time to buy him a new one before the social worker came. She did not explain why R.M. did not have a bed. She said she had since obtained beds for J.C. and R.M. She also said that she had clothing for the children in a laundry bag and that J.C. had eaten that morning.

Nick Saucedo testified he made an unannounced visit to Samantha's home on September 23 and the house was clean and furnished.

Gina Villalovos, Samantha's landlord, testified she lived two houses down from Samantha. She said she was a foster child and felt compassion for Samantha. They visited each other in their homes every couple of weeks and she saw the children frequently. She had recently seen a red Chevy Silverado which she believed was Samantha's truck. She observed Samantha to be very nurturing and loving with the children.

Recalled to testify, Samantha said she returned from Modesto at approximately 2:30 a.m. on September 9. She noticed that R.M. was feverish and had blisters in his mouth so she rushed him to the hospital. She returned home around 7:00 to 7:10 a.m. She said R.M. had a travel-type crib. After the children were removed, she remembered that his crib was in her Ford Explorer.

Following argument, the juvenile court found that the agency's removal of the children on September 9, 2013, was appropriate and that it was not in their best interests to return to Samantha. This petition ensued.

7

# DISCUSSION

## I.    Due Process

Samantha contends the juvenile court violated her due process rights by failing to set the removal hearing within the statutory timeframe and by not providing her access to the entire case file.  The delay in setting the hearing, she further contends, was prejudicial because it resulted in her not receiving visitation, leaving the children to believe they were abandoned.  Not having full access to the record prevented her from refuting "much of [Cecilia] Gomez's testimony."  (Petn. p. 6.)

### A.  Removal Hearing

Section 366.26, subdivision (n) (subdivision (n)) authorizes the agency to remove a child from a prospective adoptive parent if it believes there is a risk of physical or emotional harm.  (§ 366.26, subd. (n)(4).)  The prospective adoptive parent may object to the removal by filing a petition with the juvenile court and requesting a hearing.  (*Ibid.*)  The juvenile court must set the hearing no later than five court days after the objection is filed.  However, if the court for good cause is unable to set a hearing within that timeframe, the court must set it as soon as possible.  (§ 366.26, subd. (n)(3)(B).)

In this case, Samantha filed her objection on September 18, 2013, and the juvenile court set a removal hearing on October 17, well beyond five court days.  However, Ms. Bourn did not complain of the delay at her first appearance on October 10.  Instead, she asked for a continuance, in essence adding to any delay that already existed.  More importantly, however, Samantha fails to show how the timing of the removal hearing affected visitation.  She did not request visitation and there is no reason to believe the juvenile court would have ordered it had she done so.

### B.  Discovery

The purpose of the removal hearing under subdivision (n) is for the juvenile court to determine whether the child's interest is best served by removing the child or allowing

8

the child to remain with the prospective adoptive parent. (§ 366.26, subd. (n)(3)(B).) A prospective adoptive parent is allowed to fully participate in removal hearings but is not considered a party to the proceeding. (§ 366.26, subd. (n)(3)(C).) The court in *Wayne F. v. Superior Court* (2006) 145 Cal.App.4th 1331, 1340-1341 explained the purpose of permitting such participation: "If, at a removal hearing, the juvenile court were permitted only to hear evidence and argument from a social service or adoption agency, as a practical matter the juvenile court would be required to defer to the determination of the only active litigant in the courtroom.…" (*Id.* at p. 1341.) Full participation of a prospective adoptive parent at removal hearings is the most effective means of ensuring that the juvenile court, rather than a social service or adoption agency, determines whether removal is in a child's best interests. (*Id.* at p. 1342.)

Samantha contends the juvenile court rendered county counsel the only "active litigant" and denied her due process by not granting her access to the case file. Had she had such access, she contends she could have refuted much of Gomez's testimony. We disagree that she was denied access.

Juvenile court records are confidential with limited exceptions. (§ 827, subd. (b)(1).) The child, parent, guardian, and their attorneys have the right to inspect a juvenile case file. (§ 827, subd. (a)(1).) No such right is afforded a prospective adoptive parent.[3] Nevertheless, any person, including a prospective adoptive parent, may petition the juvenile court for disclosure of confidential records pursuant to section 827, subdivision (a)(1)(P).

In this case, the juvenile court advised Ms. Bourn that it had to take judicial notice of the case file, but offered to continue the hearing if she needed additional time. Ms.

---

[3] Samantha argues we should review the issue de novo because it raises pure questions of law. However, she has not identified any legal error requiring application of a de novo standard of review.

9

Bourn could have, but did not, take advantage of a continuance to file a section 827 petition seeking disclosure of the case file. Consequently, Samantha cannot claim that the juvenile court denied her access to the case file and that she was denied due process as a result.

## II.    Removal

Samantha contends the agency failed to establish that it was in the children's best interests to be removed from her home. To that end, she argues there was insufficient evidence that she was unable to protect the children from Sarah and was allowing contact with Sarah.

"The juvenile court has the authority and responsibility to determine whether removal from the home of a prospective adoptive parent is in the child's best interests. (§ 366.26, subd. (n)(3)(B).) If a prospective adoptive parent objects to the child's removal from the home, the [a]gency must prove by a preponderance of the evidence that removal from the prospective adoptive parent is in the child's best interests.…" (*T.W. v. Superior Court* (2012) 203 Cal.App.4th 30, 45.)

We review a juvenile court's decision to terminate placement for abuse of discretion. (*In re N.M.* (2011) 197 Cal.App.4th 159, 171.) Applying this standard, we concur with the juvenile court that the children's interests were best served by removing them from Samantha's custody in light of lingering questions about their health and safety and Samantha's poor judgment in allowing contact with Sarah.

Dependency proceedings were initiated in this case because of Sarah's drug use and her parental rights were terminated in large part because of her failure to address it. It appears, however, that Sarah opted to relinquish her parental rights to Samantha in the hope of maintaining contact with the children through her relationship with Samantha. Instead of gaining safety and stability in a new home, the children were essentially in the same position they were in before the juvenile court intervened.

10

Contrary to Samantha's contention, there is substantial evidence from which to infer Samantha was not protecting the children from Sarah. J.C. stated that Sarah lived with them. In addition, Samantha's landlord and neighbor said she saw Sarah's truck in front of the house, staff from J.C.'s school saw Sarah and Samantha together at the school to pick him up, and Sarah attended the children's medical appointments. Further, Sarah was described as being under the influence of some substance and exhibiting behavior suggesting it was methamphetamine. Finally, Gomez found Sarah in the home with Samantha and the children in the morning dressing in the closet and exhibiting the same behavior.

On this record, we find no abuse of discretion in the juvenile court's determination that it was in J.C. and R.M.'s best interests to remove them from Samantha's home.

## DISPOSITION

The petition for extraordinary writ is denied. This opinion is final as to this court.

11